And our final case for argument this morning is Ray against acting Commissioner Berryhill. Mr. Young. Thank you and it may please the court I'm Jamison Young I'm here to represent the appellant Danny J. Ray and the denial of with respect to the residual functional capacity or RFC determination and with the finding at step four of the sequential evaluation process that he was capable of performing some past work. The RFC is flawed both with respect to the assessment of physical and mental limitations. On the mental side the evidence shows that Mr. Ray has an eighth grade education with a history of special education classes and a consultative examination with consultative examiner Dr. Deborah Zera indicated diagnoses of anxiety and a learning disorder with a comment that due to poor reading and math skills he would be unable to manage his own Social Security benefits. There also is an episode of compensation with respect to a hospitalization in October of 2014 that was dealt with inconsistently in the decision. So we have all these indications here of mental problems, problems reading, problems with math, depression, anxiety, but there's really no logical bridge between that and what the RFC says about the mental limitations. Well the RFC limits him to semi-skilled tasks, right, and says that he can attend a task for a sufficient period able to manage the stress with semi-skilled. So doesn't that sound semi-skilled? What does that mean? Well I think that's troubling. To be able to understand, remember, and carry out semi-skilled tasks, I mean that's work with an SVP of three or four that can be learned in three to six months and that or math or mood issues. Is there evidence that the ALJ actually considered the difficulties with reading and math or that she discounted them? No, that really was not addressed in the decision. The argument there was that the hypothetical did mention that he has the eighth grade special education, but with specific findings about his learning disorder and difficulties and reading and math that really should have been fleshed out much more fully. And on the physical side he was limited to light work with occasional postural limitations, things like balancing, stooping, kneeling, crouching, crawling. But Mr. Ray in his hearing talked about needing a shower chair. Are you saying the hypothetical incorporated the eighth grade education? It did. I mean what the ALJ would say there is consider an individual with the claimant's past work, education, and age and then these additional limitations. So that's kind of factored in generally. But the specific limitations weren't. And physically he talks about needing a electric cart in the grocery store, being able to walk a block or less, stand 15 to 20 minutes at a time. And he was found not credible and that really is erroneous especially when the medical evidence shows an MRI with nerve root impingement. The physical consultative examination showed a positive straight leg raise test that's consistent with the nerve root impingement. Reduced grip strength, range of motion limitations, and he was generally sickly. He was pale and his fingernails. He quits his job when he can't move the children into the seat? Right. The denial was based on a step four finding that he could perform past relevant work as what they call the school bus monitor. But that's this debate about whether it's a composite job with all this unfortunate inaudible in the record. Yeah the inaudibility really is a problem. But even then it seems that a general reading of the vocational experts testimony supports a finding that there is no DOT match for what Mr. Ray did. And you're relying in part on the fact that the child care attendant position mentions help getting on the bus? Yes, yes. The child care attendant is someone in the school who helps disabled children get around and there's nothing mentioned like that in the description of school bus monitor that was used. The school bus monitor is the person who's yelling at the kids to quiet down, right? Right, that would be someone dealing with behavioral issues and there's no doubt that what Mr. Ray did was much more strenuous. The vocational expert classified it at medium. He was helping getting the wheelchairs on the bus, strap those down, lift the children into the seats. So really, you know, a finding that he could do his past relevant work is erroneous because that DOT title, the T title that was used, just doesn't match. Well they thought he could do it but only at the light level, not the medium level. Didn't they change the level as it's generally performed? The step four finding was that he can perform the school bus monitor job as it's generally performed. But really the they haven't even gotten to that point because with a composite job, there's no as generally performed to work with. There is no such thing if it's a composite job because it's composite. Right. So the vocational expert would have had to focus in more particularly on available, maybe step five. Yes, it seems the vocational expert was just trying to put something out there, throw out a DOT title that might be close. It doesn't seem that he was really keyed into the composite job issue. But there's no doubt that he confirmed that Mr. Ray's work involved duties that are not contained in the DOT's description of school bus monitor. Right, so it was not as performed. But your complaint is that going to the way it's generally performed failed to be a good enough match to his old job because of the childcare attendant aspects of the old job? Yes, under SSR 82-61, if the past work is a composite job, the inquiry is whether or not that job can be performed as it was performed, as actually performed. The national job may be different than what he was doing, is what you're saying. Yes, the description that was used for school bus monitor, a light job, just doesn't reflect what Mr. Ray did. There's no DOT counterpart here. Not even the reason he quit. He wasn't quitting because he couldn't stand in front of the bus and say, be quiet. He quit because he couldn't lift children up and put them, you know, or fix their wheelchair. Right, there's a lot of bending. He had to get down on the floor of the bus and strap the students in. Do we have any evidence in this record about the age group of the students he was serving? There really isn't. It seems that with lifting the wheelchairs and bending down to strap those in, it's pretty squarely a medium level job. That's what the vocational expert says. And that seems to be well supported in the record. The composite job argument that you're making is based on a regulation, correct? SSR 82-61. It doesn't appear to be something this court has ever applied, or discussed even. That seems to be true. There was a district court case we cited in which... Nothing from the Seventh Circuit. That's right. Are we bound by that? No, no. But what is clear is that the Social Security Administration is required to apply its own SSRs. And their own SSR says, if something is a composite job, we don't evaluate that as generally performed, because there is no as generally performed. I can reserve the rest of my time. All right, thank you very much, Mr. Young. Thank you. Ms. Hugo. Good morning, Your Honors. Or, good afternoon, I should say. No, it's still morning. Megan Hugo on behalf of the Commissioner of Social Security. I'd like to expand on some of the things that Appellant's counsel just discussed. First, with respect to the mental impairments, the inconsistency with the episode of decompensation. Now, I think it's pretty clear from reading the ALJ's decision as a whole, that when the ALJ stated at the end of her severity analysis that there were no episodes of decompensation, that was merely a typo. Earlier in the decision, she has... forgot that that episode had existed. Well, she discusses it in detail the previous period. Earlier, I know, but then when she's moving into the really critical part of her assessment, I'm just not sure why I should assume it's a typo instead of just forgetting that it was there. Well, I think she discussed it in detail prior to that, but to your point... And she doesn't factor it into her, the rest of her analysis. I'm sorry? She doesn't factor it into the rest of her analysis, the fact that there was this episode. Well, I would disagree with that. And to your Honor's point, I think you said it's a critical issue or a serious issue. The regulations don't require the finding of a severe mental impairment just because there's one episode of decompensation. The regulations say, generally, if we find no or mild limitations, then no episodes will generally find non-severe, unless the evidence shows that the person is functioning pretty poorly. And it doesn't explicitly say the converse, but that would apply here. Theoretically, we could have a moderate limitation or, as here, one episode of decompensation, but longitudinally, this person is functioning mentally very well. And so we could call it a typo, we could call it a mistake in saying that there was no episodes. It doesn't dictate the finding of a severe mental impairment when looking at the record as a whole, it shows that Mr. Ray is mentally functioning well. And I think significantly, this Court has recognized that Step 2 errors really don't have an impact on the outcome of the case, as long as the ALJ then moves on with the sequential evaluation process and adequately captures any limitations that may arise from a non-severe impairment in the RFC. And that is exactly what happened here. The ALJ said, you know, nonetheless, I'm including in the RFC the mental limitations that Mr. Ray had. And then she adopted the limitations from Drs. Hill and Shipley, who were the state agency doctors who reviewed the medical record. This is another case where the ALJ draws an inference that somebody's failure to follow up on different types of medical recommendations indicates that the symptoms aren't very serious. I'm looking at page 10 of the ALJ's opinion. The claimant testified that he failed to follow up due to financial reasons and testified that he forgets to take his medication. Now, this is a person of very limited mental ability. Undersign finds these arguments unpersuasive. In fact, the noncompliance suggests, but I don't see where she says, because he has plenty of money or because he's a bright guy and never forgets anything else, or just sort of, you know, I don't think that's persuasive. Well, the ALJ questioned Mr. Ray at the hearing, and I don't recall the exact wording of the regulation, but essentially it says that the ALJ can consider a failure to follow treatment but has to explore potential reasons why treatment was not pursued. Right, and he offers two reasons, and she doesn't explain here, at least, why she isn't persuaded by the financial reasons and the forgetfulness. Right. Even though she has lots of other things in here that show that Mr. Ray is not particularly bright. Well, a few points vary on her. First, the ALJ did explore it at the hearing. There's not really, you know, an articulation standard in the record about how far the ALJ has to go in saying why they're not finding this persuasive. The ALJ did point out at the hearing, okay, well, you say you didn't go to the cardiology appointment because you lost your Medicaid, but you're not taking your medications even when you're insured, and that's when he said, I forgot. You know, the ALJ didn't have to find that persuasive, especially he didn't really offer any explanation about, he pointed out he missed a referral for his depression or didn't want a referral for his depression. He didn't make any explanation for why he didn't do that. And, in fact, the record showed at that time he was getting free care because of the volunteers and medicine clinic. So, you know, on the face of the records itself, he was getting free care at that time. Likewise, with the spinal workup, the record itself mentions that he had insurance. We're going to have to discuss referrals per his insurance. So on the face of the documents even, it doesn't really show any reason why. His GAF score is low. I understand that the DSM doesn't use GAF anymore, but it's in a lot of these old records. It's very low, and there's the evidence that he's, you know, again, he's got a very low level of education. Why doesn't the ALJ have to take that into account in explaining the inferences? It's not as though the ALJ is asking whether one of us, you know, is properly following up on medical care. Well, the ALJ did take his mental abilities into account, so I would kind of take issue with the premise of that. The ALJ adopted the limitations that Drs. Hill and Shipley offered, and they consider Dr. Zera's reports, both of them. Dr. Zera examined him in December of 2013, and then again in the next month to administer an IQ test. And within the reports of the state agency doctors, they go through and identify some of the information that they considered, and they explicitly mention in there that she had an ADIQ, that Dr. Zera had noted potentially that he had some learning disorders with impairment, I believe, in reading and math. Those are cited in Commissioner's Brief, the pages for those that are in the record. And then, synthesizing that raw information of those consultative reports, Drs. Hill and Shipley looked at that and said, nevertheless, he can do semi-skilled work. And I think Your Honors had discussed earlier. Yeah, I mean, that's a little bit different from whether, you know, faced with the nightmare that getting medical care is in today's world with all the forms and papers and appointments, somebody might be overwhelmed. And that he didn't say that. You know, the ALJ gave him a chance to explain, and I think based on the record before her, looked at what was before her, the only reasons he gave was financial reasons and the fact that he forgot. So can we go back to this exchange with the vocational expert about composite job, which is set forth a couple places where there's just this inaudible, inaudible. But the first answer that the vocational expert gives to counsel's question, counsel says, I think his job would be a composite or hybrid of someone working with handicapped students. It goes on, and that's kind of what I'm getting at. The vocational expert, that is what I testified to. So it seems to me that as they go back and forth, whatever that last inaudible was, the vocational expert has now said a couple of times that it's a hybrid, that there isn't a single DOT classification that captures it. Where does it say lifting up children physically and hauling medical equipment onto a bus in the bus monitor job? And that's exactly the point, why he said I classified it as medium, even though the DOT says this is a light job to accommodate that. But it was a whole additional function, though. It wasn't, I mean, we've read the description of school monitor. This is different. This is physical care of a child, lifting him up. Now, I would take issue with that. I mean, the vocational expert, if you look at the substance of his testimony, and there are a few places of inaudible, but that's common in a hearing transcript. I think the court needs to look at this as a whole. And when you look at this as a whole, it seems clearer that he was rejecting this notion. He says he could perform, this is his past work. He specifically said his past work was a school bus monitor. In the district court case, the Peterson case that Appellant cited, the vocational expert there, out of the gate, said there's two DOT numbers. That didn't happen here. Then, when he's pressed by counsel, he says, is there something else? It doesn't seem like he can go back to that job. That is what I testified to. From the substance of the whole conversation, that remark of, that is what I testified to, is just confirming what is not disputed here. He can't do it at the medium level. And that's exactly what the vocational expert said. Do you agree that if his prior job was a composite job, that the ALJ should not have referred to him being able to do his past job as general? That's what our regulations say, because there's no job in the economy which to return him to, so he would have had to have been able to do that. Have to go to step five, maybe, or something like that. Right. But I think, again, reading this as a whole, and then he even says, when counsel asks, well, is there a more specific DOT number for someone that's specifically working with kids? He says, no, and the reason I know that is because I've done job analysis on positions like this, where it's the primary function is assisting adults and children with transportation. That's the primary function of the school bus monitor job, whether it's adults, whether it's children, whether it's children with some impairments, you're riding the bus with them. And then when counsel points out this classroom-aid job, he pushes back on that again. Which includes helping with the bus. Well, that's one part of the job. Oh, no, it's one part of the job. The primary function of the job is assisting them in a classroom, and I think that's the distinction that Mr. Van Winkle, if you look at his testimony as a whole, he's pushing back on that notion of is there two DOT numbers required here or not? And he's saying, no, it's not in the classroom. He's not assisting them with personal care. You know, the bus monitor job doesn't encompass everything he did, and that's accounted for with the medium exertional level. It's not a composite job. Okay. Thank you. Unless the court has any more questions, I'll just respectfully ask that you affirm the commissioner's decision. All right. Thank you so much. Anything further, Mr. Young? I don't have a whole lot to add, but it is interesting that the vocational expert here said, well, I've done a job analysis on a job where someone does help handicapped individuals on and off a bus, and that's not reflected in the Dictionary of Occupational Titles, and it could have a lot to do with the fact that that is a document that was last updated in 1993, so the vocational expert is limited in trying to match what Mr. Ray did within the last 10 years or so to a manual that is outdated. The vocational expert's name was David Van Winkle. It seems he might as well have had Rip Van Winkle there. You know, you need to use a document from 1993. So he's limited, but the bottom line is there's no counterpart in the DOT to what Mr. Ray did, and he can't perform his past work. It was denied at Step 4 for that basis, and that's erroneous, and we would request that the case be remanded. All right. Well, thank you very much. Thanks to both counsel. We'll take the case under advisement, and the court will be adjourned.